1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  MIKA MILLER, | Case No. 1:13-cv-01597-SAB |
| 12        Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S SOCIAL |
| 13     v. | SECURITY APPEAL AND DEFENDANT'S CROSS MOTION FOR SUMMARY |
| 14  COMMISSIONER OF SOCIAL SECURITY, | JUDGMENT AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS |
| 15        Defendant. | |
| 16 | (ECF Nos. 13, 14, 15) |

17

## I.

18

## INTRODUCTION

19

20         Plaintiff Mika Miller ("Plaintiff") seeks judicial review of a final decision of the
Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for
21
disability benefits pursuant to the Social Security Act and Defendant's cross motion for summary
22
judgment.  The matter is currently before the Court on the parties' briefs, which were submitted,
23
without oral argument, to Magistrate Judge Stanley A. Boone.[1]
24
25         Plaintiff suffers from obesity, status post injury to non-dominant left upper extremity;
posttraumatic stress disorder; and polysubstance dependence in early remission.  For the reasons
26
set forth below, Plaintiff's Social Security appeal and Defendant's cross motion for summary
27

28
---
[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 6, 7.)

1  judgment shall be granted in part and denied in part.

2                                    **II.**

3                  **FACTUAL AND PROCEDURAL BACKGROUND**

4          Plaintiff protectively filed an application for a period of disability and disability insurance

5  benefits and a Title XVI application for supplemental security income on May 6, 2010.  (AR

6  147-150, 151-152.)  Plaintiff's applications were initially denied on September 23, 2010, and

7  denied upon reconsideration on April 1, 2011.  (AR 85-88, 89-92, 96-99, 100-103.)  Plaintiff

8  requested and received a hearing before Administrative Law Judge Sherrill A. LaPrade Carvalho

9  ("the ALJ").  Plaintiff appeared for a hearing on May 24, 2012.  (AR 50-80.)  On June 14, 2012,

10  the ALJ found that Plaintiff was not disabled.  (AR 22-36.)  The Appeals Council denied

11  Plaintiff's request for review on August 7, 2013.  (AR 1-4.)

12          **A.      Hearing Testimony**

13          Plaintiff testified at the hearing on May 24, 2012, without representation of counsel.  (AR

14  52-67; 73-76.)  The ALJ explained Plaintiff's right to be represented by an attorney or non-

15  attorney at the hearing and offered Plaintiff the opportunity to have his mother present at the

16  hearing.  (AR 52-56.)  Plaintiff wished to proceed with the hearing.  (AR 57.)

17          Plaintiff was born on October 7, 1966, and graduated high school.  (AR 58.)  Plaintiff has

18  attended two years of community college and had some vocational training.  (AR 59.)  He lives

19  at home with his mother.  (AR 58.)  Plaintiff has used marijuana, cocaine, and alcohol in the

20  past.  (AR 75.)  Plaintiff has not used cocaine in twenty years or marijuana and alcohol for about

21  a year.  (AR 75-76.)

22          During the hearing Plaintiff complained that the pain in his arm was killing him.  (AR

23  59.)  He stated the pain goes from the middle of his back through his fingers.  (AR 59.)  The

24  fingers are numb and tingling all the time.  (AR 60.)  The doctor told him to go to the local

25  hospital and sign up for something if he did not have insurance, but Plaintiff has not had the

26  chance to do so.  (AR 60.)  Plaintiff takes Extra Strength Excedrin for the pain.  (AR 60.)

27  Plaintiff has not taken prescription pain medication for about a month.  (AR 60.)

28          Plaintiff was stabbed in the abdomen and his arm was slashed during a robbery.  (AR 61.)

1    He had two surgeries on his arm and three of the fingers are numb.  (AR 61.)  The pain in

2    Plaintiff's arm comes and goes.  (AR 61.)

3           Plaintiff is unable to work because his mother says he has a mental attitude problem.

4    (AR 61.)  He does not get along well with people.  (AR 61.)  He has to watch out for people that

5    are after him.  (AR 61-62.)

6           Plaintiff last worked in 2009 and has looked for work since then.  (AR 62.)  Plaintiff has

7    looked for side jobs, such as yard work.  (AR 62.)  Plaintiff might be able to work depending on

8    the people.  (AR 62.)  He will not work for anyone who is mean.  (AR 63.)  Plaintiff has not

9    worked at all since he was stabbed.  (AR 64.)

10          Plaintiff sees a doctor at behavioral mental health a couple times a month.  (AR 64-65.)

11   He is taking medication that helps him a little bit.  (AR 66.)  Plaintiff was put in a mental

12   hospital a couple years ago after the doctor said he almost hit a little kid.  (AR 66.)

13          A vocational expert ("the VE"), Judith Najerian, testified at the hearing.  (AR 67-78.)

14   The VE testified that Plaintiff's prior job history was a box bender, medium, SVP 1, unskilled;

15   cook/helper, medium, SVP 2, unskilled; labor stores, medium, SVP 2, unskilled; construction

16   worker II or painter/helper, light; packager/hand, medium, SVP 2, unskilled; and flagger, SVP 2,

17   unskilled.  (AR 67-71.)

18          The ALJ presented a hypothetical of an individual of Plaintiff's age, education, and work

19   history, who is able to lift and or carry up to fifty pounds occasionally and twenty five pounds

20   frequently; who can sit, stand, and or walk up to six hours in an eight hour workday; can

21   occasionally handle, finger, and feel with the non-dominant left upper extremity.  This individual

22   is limited to simple, routine tasks and can have occasional contact with the public and could

23   work in the presence of coworkers and supervisors with occasional interaction with them.  (AR

24   72.)  The VE opined that this individual would be able to perform Plaintiff's past work as a

25   flagger.  (AR 73.)  This job would require frequent handling and occasional fingering, but the

26   handling would be gripping the flag with the dominant hand.  (AR 73.)

27          The VE opined that this individual would be able to perform other jobs such as a bakery

28   worker/conveyor line, 313 jobs in California and nine times that in the United States;

blending/paint tender/helper, handling is occasional and fingering is less than occasional; 153 jobs in California and nine times that in the United States; and scaling machine operator, both handling and fingering are occasional, 813 jobs in California and nine times that in the United States.  (AR 73-74.)

The ALJ presented a second hypothetical of an individual of Plaintiff's age, education, and work experience with the same exertional and non-exertional limitations, who could perform simple routine tasks, occasional contact with the public and could perform isolated work requiring only occasional supervision.  (AR 76-77.)  The VE opined that this individual would be unable to perform any past work due to the isolation requirement.  (AR 76-77.)  This individual would be able to work as a surveillance monitor, sedentary, SVP 2, 2,566 jobs in California and nine times that in the United States.  (AR 77.)

The ALJ presented a third hypothetical with the same exertional and non-exertional limitations as previously stated, able to perform simple routine tasks with occasional public contact and a low-stress job requiring only occasional changes in the work setting.  (AR 78.)  The VE opined that this individual would be able to perform Plaintiff's prior work as a flagger and the jobs identified in the first hypothetical.  (AR 78.)

**B.      ALJ Findings**

The ALJ found that Plaintiff had sufficient quarters to remain insured through June 30, 2013 and must establish disability on or before that date to be entitled to benefits.  (AR 25.)  The ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act from March 30, 2010, the date Plaintiff alleged his disability began, through the date of decision.  (AR 25.)

Plaintiff has the following severe impairments: status post injury to the non-dominant left upper extremity; posttraumatic stress disorder; and polysubstance dependence in early remission.  (AR 27.)  Plaintiff's impairments, alone or in combination, do not meet or equal the severity of a listed impairment.  (AR 28.)  Plaintiff has the residual functional capacity to perform a range of medium work and can lift and or carry 50 pounds occasionally and 25 pound frequently; stand, walk, and or sit for six hours in an eight hour workday with regular breaks; unlimited in ability to

push and pull other than the limitations on lifting; occasionally handle, finger, and feel with the non-dominant left upper extremity; limited to performing simple routine tasks; occasional contact with the public; and can work in the presence of coworkers and supervisors but is limited to occasional interaction with them.  (AR 29.)

The claimant is able to perform his past relevant work as a flagger.  (AR 33.)  Plaintiff has not been under a period of disability as defined in the Social Security Act.  (AR 35.)

### III.

### LEGAL STANDARD

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.")

///

///

1          **IV.**

2          **DISCUSSION AND ANALYSIS**

3          Plaintiff contends that the ALJ erred by failing to credit the limits stated by Dr. Walker[2]

4    and finding Plaintiff's subjective complaints to not be credible and the appeals counsel erred by

5    failing to consider the opinion of Dr. Kalman.

6          **A.      Plaintiff's Credibility**

7          Plaintiff contends that the ALJ erred by finding that his subjective complaints are not

8    credible.  The Commissioner argues that the ALJ set forth specific and reasons supported by

9    substantial evidence in making the credibility determination.

10         Determining whether a claimant's testimony regarding subjective pain or symptoms is

11   credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104,

12   1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective

13   medical evidence of an underlying impairment which could reasonably be expected to produce

14   the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir.

15   2007) (internal punctuation and citations omitted).  This does not require the claimant to show

16   that her impairment could be expected to cause the severity of the symptoms that are alleged, but

17   only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

18         Second, if the first test is met and there is no evidence of malingering, the ALJ can only

19   reject the claimant's testimony regarding the severity of her symptoms by offering "clear and

20   convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social

21   Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that

22   support this conclusion and the findings must be sufficiently specific to allow a reviewing court

23   to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

24   arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir.

25   2004) (internal punctuation and citations omitted).

26   ───────────────

27   [2] Initially, Plaintiff contended that the ALJ erred by failing to address the opinion of Dr. Rush.  Defendant responded
     that since Dr. Rush's opinion was issued prior to the time period at issue in this action and in connection with
28   Plaintiff's previous application for Social Security benefits it is not relevant to the current application.  Plaintiff
     subsequently withdrew the argument that the ALJ erred by failing to consider the opinion of Dr. Rush.

1    In assessing the claimant's credibility, the ALJ may consider "(1) ordinary techniques of

2  credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

3  concerning the symptoms, and other testimony by the claimant that appears less than candid;

4  [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a

5  prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)

6  (quoting Smolen, 80 F.3d at 1284).

7        1.    Failure to Seek Treatment

8    Plaintiff contends that the ALJ erred by considering the lack of treatment because due to

9  the nature of his symptoms; weakness, limited motion, and lack of sensation stemming from

10  nerve damage; his physician could not recommend any other procedures during this time.

11  However, the ALJ specifically referenced Plaintiff's allegations of pain, which Plaintiff does not

12  address.

13    The ALJ considered that Plaintiff complained he was unable to work due to pain in his

14  left arm which was injured when he was stabbed during a robbery.  (AR 29.)  Plaintiff

15  complained of pain around the left bicep muscle and tingling and numbness in his fingers.  (AR

16  29.)  The ALJ found that Plaintiff's medically determinable impairments could reasonably be

17  expected to cause some of the alleged symptoms, but the statements regarding the intensity,

18  persistence and limiting effects of the symptoms were not credible.  (AR 30.)

19    Although Plaintiff alleged he had significant pain and functional limitations, there is no

20  medical evidence that he received any additional treatment after December 2010.  (AR 30.)  The

21  ALJ found that if Plaintiff's symptoms were as severe and debilitating as he stated it would be

22  reasonable to assume he would have sought additional medical treatment over the year and one

23  half since his last documented treatment.  (AR 30.)

24    During the May 24, 2010 hearing, Plaintiff told the ALJ that his arm was killing him.

25  (AR 59.)  He stated that his pain was usually worse.  (AR 59.)  Plaintiff identified the pain as

26  starting from the middle of his back and going through his fingers.  (AR 59.)  Plaintiff stated that

27  his fingers were numb and tingling all the time and the muscle all the way around into his back

28  caused him pain.  (AR 60.)  Plaintiff said that he had been to the emergency room for the pain

and received medication.  (AR 61.)  The doctor told him to go to the hospital to sign up for something since he did not have insurance, but he had not got around to going to the hospital.  (AR 60.)  Later in the hearing, Plaintiff complained that he was hurting so bad he needed to get some air and stand up.  (AR 67.)

The ALJ can properly consider that Plaintiff has not sought treatment for his alleged symptoms.  In this instance, the record supports the ALJ's finding that Plaintiff did not seek medical treatment for pain during the one and one half year since he last saw the specialist regarding his hand.  Further, the fact that Plaintiff did not find his pain significant enough to go to the hospital to sign up for the program the emergency room doctor suggested is substantial evidence that Plaintiff's pain is not as severe he alleges.

2.    Hallucinations

The ALJ found that Plaintiff's allegations regarding his auditory and visual hallucinations were not credible.  Plaintiff told Dr. Gratton that he had begun experiencing visual and auditory hallucinations only months prior to his consultative exam.  Dr. Gratton found that it was extremely unusual for schizophrenia to begin in the 40's and that Plaintiff's description of the occurrences was not credible.  (AR 516.)  The ALJ found that Plaintiff had not alleged the hallucinations during the May 24, 2010 hearing and there was no evidence that he complained of hallucinations to treating physicians.  (AR 30.)  However, the record demonstrates that Plaintiff had been treated for hallucinations since at least June 29, 2004 where the record indicates he had been hearing voices since 1987.  (AR 480.)  There are also intermittent references to hallucinations throughout the medical record.  (AR 481, 482, 483, 484, 487, 488, 392, 429, 453, 503.)  This finding is not supported by substantial evidence in the record.

3.    Routine and Conservative Treatment

Plaintiff contends that the treatment he received was not routine and conservative.  He received surgery for his hand and continued to see a hand surgeon and attend physical therapy.  Further, Plaintiff contends that his mental illness has been treated with anti-psychotic and anti-depressant medications.

The ALJ found that the credibility of Plaintiff's allegations regarding the severity of his

symptoms and limitations is diminished due to the lack of more aggressive treatment for his complaints of left upper extremity pain and mental illness.  (AR 30.)  The ALJ may properly consider that Plaintiff only received conservative treatment for his impairments.  Tommasetti, 533 F.3d at 1039.  In regards to Plaintiff's complaints of pain, he is being treated with Extra Strength Excedrin.  Evidence that Plaintiff only received conservative treatment is sufficient to discount a claimant's testimony regarding the severity of his impairment.  Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).  Further, as discussed above, the ALJ properly considered that he was advised to apply at the hospital for a program since he did not have insurance and Plaintiff did not get around to it.  The ALJ properly considered that Plaintiff only received conservative treatment for his alleged debilitating pain.

Similarly, review of the medical record demonstrates that Plaintiff only received intermittent outpatient treatment for his mental health issues and that his symptoms were controlled when he was compliant with his medication.[3]  (AR 479, 480, 482, 483, 484, 485, 488, 489, 490, 506, 546, 563, )  Plaintiff was intoxicated on March 31, 2010 when he was hospitalized after being stabbed.  (AR 420.)  While Plaintiff has submitted evidence of hospitalization for other issues, there are no medical records demonstrating that Plaintiff received in-patient treatment for any mental health issues, contrary to his statements that he has on multiple occasions been hospitalized for such treatment.  The ALJ's determination that Plaintiff only received routine and conservative treatment for his mental health issues is supported by substantial evidence in the record.

The ALJ did provide clear and convincing reasons supported by substantial evidence to question Plaintiff's credibility.

### B.    Plaintiff's Limitations Due to the Impairment of His Left Hand

Plaintiff also contends that the ALJ erred by ignoring Dr. Walker's finding that Plaintiff had no practical use of his left hand for reaching, pushing, pulling, grasping or fingering.

---

[3] The Court does note that there are statements by Plaintiff and his family that he received inpatient treatment for his mental health issues, but no medical records were provided to substantiate these claims.  Further, due to the false nature of statements made to Dr. Kalman by Plaintiff's family members during the examination, the reliability of these statements is questionable.

1   Defendant argues that Dr. Walker's inconsistent opinion appears to be simply recounting
2   Plaintiff's symptoms and his own testing found Plaintiff's fine and gross motor skills to be
3   normal in both hands and that he was able to pick up small objects and manipulate objects
4   without difficulty.

5          Dr. Walker saw Plaintiff for a consultative examination on July 26, 2010.  Dr. Walker
6   completed an All Systems Form.  (AR 458-61.)  The doctor is to describe the claimant's fine and
7   gross coordination of the affected upper extremities.  Dr. Walker reported, "No practical use of
8   left hand for reaching, pushing, pulling, grasping or fingering."  (AR 461.)  As examples of the
9   functional use of the impaired extremity, Dr. Walker stated, "Claimant will have difficulty with
10  use of the left hand for personal hygiene, filing, sorting, handling, typing, buttoning or tying."
11  (AR 461.)

12         In his report, Dr. Walker states that he reviewed Plaintiff's medical records and found a
13  note dated May 5, 2010 by Dr. Howell to be significant.  (AR 462.)  "This letter states that Mr.
14  Miller had a laceration to his arm with injury to his brachial artery and median nerve.  He will
15  certainly never gain full function of his left arm.  He will always have decreased sensation of the
16  thumb, index, and long finger.  He will have decreased grip strength and decreased use of his
17  thumb."  (AR 462.)

18         Dr. Walker opined that Plaintiff's daily living activities would be impacted because
19  Plaintiff cannot lift anything with his left hand and is not really able to use his left hand for any
20  functions.  (AR 462.)  As relevant here, Dr. Walker found weakness in Plaintiff's hand.  (AR
21  463.)  Plaintiff's reflexes were 2/4 in both his upper and lower extremities.  (AR 464.)  Fine and
22  gross manipulations were normal with the right and left hands.  Plaintiff was able to pick up
23  small objects and manipulate objects without difficulty.  (AR 464.)  Plaintiff was able to stoop
24  and pick up items off the floor with both hands.  (AR 464.)  Dr. Walker found that Plaintiff had
25  limited use of the left hand.  (AR 465.)

26         The ALJ has an independent "duty to fully and fairly develop the record and to assure
27  that the claimant's interests are considered."  Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir.
28  2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  The ALJ must be

especially diligent when the claimant is unrepresented.  McLeod v. Astrue, 640 F.3d 881, 885
(9th Cir. 2011)  "[W]here the claimant is not represented, it is incumbent upon the ALJ to
scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.  He
must be especially diligent in ensuring that favorable as well as unfavorable facts and
circumstances are elicited."  Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1992) ( quoting Cox
v. Califano, 587 F.2d 988, 991 (9th Cir. 1978)).   The ALJ may discharge this duty by
subpoenaing or submitting questions to the claimant's physician, continuing the hearing, or
keeping the record open after the hearing to allow the claimant to supplement the record.
Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  Further, the ALJ's duty to fully
develop the record is heightened where the claimant may be mentally disabled and, therefore,
unable to protect his own interests.  Higbee, 975 F.2d at 562.

In this instance, there was a clear inconsistency in Dr. Walker's opinion.  On August 18,
2010, Dr. Model Neway completed a case analysis and noted that the finding that Plaintiff's fine
and gross manipulation was normal on the right and left hands and his ability to pick up and
manipulate objects without difficulty was inconsistent with the evidence.  (AR 466.)  Dr. Neway
requested a follow up as there in inconsistency in the consultative examination about function.
(AR 466, 474.)

The ALJ considered the opinion of Dr. Walker and gave it great weight finding that Dr.
Walker had the opportunity to perform a full evaluation of Plaintiff and concluded that he had no
functional restrictions other than those restrictions regarding the use of the left upper extremity.
(AR 32.)  The ALJ found this opinion generally consistent with the residual functional capacity
and supported by the medical evidence which documented difficulty with gripping and
manipulation of the left upper extremity.  (AR 32.)  The ALJ found that Plaintiff is unlimited as
to pushing and pulling, and can occasionally handle, finger, and feel with the non-dominant left
upper extremity.  (AR 29.)

In looking at Dr. Walker's report, the statement that Plaintiff is not able to use his left
hand for any functions appears to be Plaintiff's recitation of his physical limitations.  However,
the form which was completed by Dr. Walker shows that Plaintiff rated 1/5 for pinch and grip in

11

1   his left hand.  (AR 460.)  This is consistent with the statement that Plaintiff had no practical use

2   of the left hand for reaching, pushing, pulling, grasping or fingering and that he would have

3   difficulty with using his left hand for filing, sorting, handling, typing, buttoning, or tying.  (AR

4   461.)

5        Dr. Walker also found that Plaintiff's fine and gross manipulations were normal with the

6   right and left hands and he was able to pick up small objects and manipulate objects without

7   difficulty and pick up items off the floor with both hands.  These inconsistent findings were

8   noted by Dr. Neway who requested a follow up as to Plaintiff's function.  No follow-up was

9   done.  While recognizing that Dr. Walker found Plaintiff to have no practical use of his left hand

10  (AR 31), the ALJ relied on these inconsistent findings in determining Plaintiff's residual

11  functional capacity.

12       In his May 5, 2010, letter, Dr. Howell stated that he expected Plaintiff to have a good

13  recovery, but he would certainly never regain full function of his left arm and will always have

14  decreased sensation in the thumb, index, and long finger and will have decreased grip strength

15  and decreased use of the thumb.  (AR 628.)  Although it appears that Plaintiff may have some

16  use of his left hand, the ALJ's determination that Plaintiff was able to occasionally handle, finger

17  and feel with the non-dominant left upper extremity is not supported by substantial evidence in

18  the record.  This action shall be remanded for further evidentiary development on the extent of

19  Plaintiff's functional limitations in using his left hand.

20       **C.    Plaintiff's Limitations Due to Mental Health Issues**

21       Finally, Plaintiff claims that the Commissioner committed legal error by failing to

22  consider the opinion of Dr. Kalman which was submitted on appeal.  Defendant argues that the

23  Appeals Council's decision not to review Dr. Kalman's opinion is not reviewable by this Court.

24  Defendant further contends that even if the ALJ had Dr. Kalman's opinion it is contradicted by

25  Plaintiff's own work history.  Plaintiff replies that he is not seeking reversal of the Appeals

26  Council's decision, but argues that Dr. Kalman's report undermines the ALJ's decision that

27  Plaintiff is not disabled.

28       The ALJ found that Plaintiff had sufficient quarters to remain insured through June 30,

2013 and must establish disability on or before that date to be entitled to benefits. (AR 25.) Dr. Kalman examined Plaintiff on June 14, 2013. (AR 631-634, 637-644.) Dr. Kalman's report was submitted to the Appeals Council who found that the opinion was issued after the hearing and was about a later time and does not affect the decision as to whether Plaintiff was disabled before June 14, 2012. (AR 2.)

When new evidence is submitted to the Appeals Council that was not before the ALJ and the Appeals Council considers it in denying review of the ALJ's decision, the new evidence is part of the administrative record. Brewes v. Commissioner of Social Sec. Admin., 682 F.3d 1157, 1160 (9th Cir. 2012). In this instance, Dr. Kalman's report was not considered in denying the review of the ALJ's decision because it was found to be for a period after the ALJ issued his decision and does not affect the decision as to whether Plaintiff was disabled before June 14, 2012. (AR 2.)

The Social Security Act grants the district court jurisdiction to review final decisions of the Commissioner. Klemm v. Astrue, 543 F.3d 1139, 1144 (9th Cir. 2008)( quoting 42 U.S.C. § 405(g)). An exception to the final decision rule applies "to any colorable constitutional claim of due process violation that implicates a due process right either to a meaningful opportunity to be heard or to seek reconsideration of an adverse benefits determination." Klemm, 543 F.3d at 1144 (citations omitted). "A constitutional claim is colorable if it is "not 'wholly insubstantial, immaterial, or frivolous.' " Id. Plaintiff does not argue that the failure to review Dr. Kalman's opinion constitutes a due process violation, rather he argues that the Appeals Council improperly rejected the consultative examiner's opinion.

The Ninth Circuit has held that "medical evaluations made after the expiration of a claimant's insured status are relevant to the evaluation of the preexisting condition." Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1233 (9th Cir. 2011) (quoting Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1996)). The district court can consider the opinion of a physician that was rejected by the Appeals Council in determining "whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error." Taylor, 659 F.3d at 1232.

1    The ALJ gave great weight to the State agency mental review consultant on initial

2    review.  (AR 32.)  These opinions were found to be generally consistent with the residual

3    functional capacity limitations assessed in the decision.  (AR 32.)  The ALJ gave some weight,

4    but not great weight to the opinion of consultative examiner, Dr. Gratton.  (AR 32.)

5        1.    Relevant Medical Record

6        On April 27, 2010, Plaintiff was seen by LCSW Raymond Stegall for an in clinic

7    behavioral health assessment.  (AR 496-501.)  Plaintiff reported that he was separated from his

8    wife and living with a friend.  (AR 497.)  Plaintiff reported no substance abuse since January and

9    episodic substance abuse up to January 2010.  (AR 497.)  Plaintiff had a fair support network of

10   family and friends.  (AR 497.)  Plaintiff was found to have eight of thirteen behaviors consistent

11   with bipolar disorder.  (AR 498).  Plaintiff complained of persistent re-experience of trauma,

12   racing thoughts, significant mood instability, and insomnia.  (AR 500.)

13       Plaintiff saw Dr. Perez on May 25, 2010.  (AR 544-549.)  Plaintiff reported having

14   flashbacks and that his medications had made him calm in the past.  (AR 544.)  Plaintiff was on

15   his fifth rehab for marijuana and cocaine.  (AR 544.)  Plaintiff used to be a very heavy drinker,

16   even blacking out, and drinks a can of beer on occasion to help him sleep.  (AR 544.)  Plaintiff

17   complained of low energy, racing thoughts, and depressed mood.  (AR 545.)  Plaintiff stated that

18   he messes up when he stops taking his medication and he last took medication a few years ago.

19   (AR 545.)

20       Dr. Perez found Plaintiff to be alert and oriented to person, place, and time.  (AR 545.)

21   His interpersonal behavior was bizarre and he avoided eye contact.  (AR 545.)  Plaintiff was

22   fidgeting.  (AR 545.)  Plaintiff's speech rate and volume were normal.  (AR 546.)  Plaintiff had

23   impaired long term memory.  (AR 546.)  His mood was bland and affect blunted.  (AR 546.)

24   Thought process was circumlocuitous and thought content was paranoid/persecutory.  (AR 546.)

25   Plaintiff denied hallucinations.  (AR 546.)  Plaintiff exhibited regressed behavior by making

26   humming sounds and moving from side to side.  (AR 546.)

27       On June 9, 2010, Plaintiff was seen again by Dr. Perez.  (AR 502-503.)  Plaintiff came to

28   the appointment on his bicycle.  (AR 502.)  Plaintiff was angry with the police as he had been

1   arrested for a drunk and disorderly.  (AR 502.)  Plaintiff was worried that a lady in the parking
2   lot was going to steal his bicycle.  (AR 502.)  Plaintiff's wife says that he can live with her if he
3   takes his medication.  (AR 502.)

4       Plaintiff was alert and oriented to person, place, and time.  (AR 503.)  He was
5   cooperative, but restless.  (AR 503.)  Plaintiff's speech was normal and his memory was grossly
6   intact.  (AR 503.)  Plaintiff mood and affect were anxious.  (AR 503.)  Plaintiff's thought process
7   was coherent; and his thought content was paranoid.  (AR 503.)  Plaintiff had auditory
8   hallucinations, hearing voices telling him to "watch out" and "watch your back" and to hit
9   people, mainly when they sneak up on him.  (AR 503.)  Plaintiff was unable to sit in the office,
10  sanding the wood on the window with his nails and playing with a rubber band on the desk.  (AR
11  503.)

12      On July 26, 2010, Plaintiff was examined by Dr. Walker.  Plaintiff reported that he is able
13  to handle his own money, go to the grocery store, can lift 20 pounds with his right hand without
14  difficulty, and can help out around the house using his right hand.  (AR 462.)  Plaintiff did pace
15  around the room and was somewhat inattentive, but answered questions fairly appropriately.
16  (AR 463.)  Plaintiff's affect was flat, he was oriented to person, place, time and current events.
17  (AR 464.)

18      Plaintiff saw Dr. Perez again on July 28, 2010.  (AR 506-507.)  Plaintiff stated that he
19  received Zyprexa in jail and was better on the Zyprexa.  (AR 506.)  Plaintiff reported staying at
20  home thinking that people were out to get him.  (AR 506.)  Plaintiff was alert and oriented to
21  person, place, and time.  (AR 506.)  Plaintiff was cooperative and calm.  (AR 507.)  His memory
22  was grossly intact.  (AR 507.)  Mood and affect were anxious.  (AR 507.)  Plaintiff's thought
23  process was coherent; and his thought content was paranoid.  (AR 507.)  Plaintiff denied any
24  hallucinations.  (AR 507.)

25      Dr. Perez saw Plaintiff on August 25, 2010.  (AR 510-512.)  Plaintiff reported that he was
26  living with his wife and had not started his Depakote.  (AR 510.)  Plaintiff was alert and oriented
27  to person, place, and time.  (AR 510.)  He was cooperative, but fidgeting.  (AR 511.)  Plaintiff's
28

1    speech was normal and memory was grossly intact.  (AR 511.)  Mood and affect were euthymic.[4]

2    (AR 511.)  Plaintiff's thought process was coherent; and his thought content was persecutory.

3    (AR 511.)  Plaintiff denied any hallucinations.  (AR 511.)  Plaintiff was unable to work due to

4    the injury to his arm.  (AR 512.)

5         Plaintiff was seen for a consultative examination by Dr. Gratton on September 14, 2010.

6    (AR 514-517.)  Plaintiff came to the examination unaccompanied on public transit.  (AR 514.)

7    Plaintiff reported three inpatient stays for psychiatric care at Cobb Community Hospital for

8    treatment of bipolar disorder and schizophrenia.  (AR 514.)  Plaintiff stated he had been clean

9    and sober for nine months.  (AR 514.)  Plaintiff had last worked on an assembly line for two

10   years and was let go in February 2010 when work slowed down.  (AR 514.)  Plaintiff was living

11   with his wife and daughter and reported that he was able to structure and execute his daily

12   routine.  (AR 515.)  Plaintiff's daily activities included fixing breakfast, reading the newspaper,

13   sitting on the patio drinking coffee and smoking cigarettes, and watching television.  (AR 515.)

14   Plaintiff regularly attended church.  (AR 515.)  Plaintiff was unable to do any yard work, house

15   cleaning or grocery shopping, and his wife prepares all meals due to the injury to his left arm.

16   (AR 515.)  Plaintiff needed help in all aspects of bathing, dressing, and hair care.  (AR 515.)  He

17   was able to help with the laundry and reported no difficulty with sorting, measuring detergent

18   accurately, and adjusting the settings on the washer and dryer.  (AR 515.)  Plaintiff believed that

19   he was capable of all aspects of bill paying and financial management.  (AR 515.)

20        Plaintiff reported that he began having auditory and visual hallucinations two months

21   prior to the examination.  (AR 515.)  He heard voices telling him to "watch out" because

22   someone was going to get him.  (AR 515.)  Plaintiff was unable to give any other information

23   about auditory hallucinations and could or would not elaborate on visual hallucinations.  (AR

24   515.)  Dr. Gratton believed that Plaintiff's portrayal of his activities of daily living were possibly

25   under reported.  (AR 515.)

26        Plaintiff walked without the aid of any devices and appeared in no apparent physical

27

28   [4] Moderation of mood, not manic or depressed.  Stedman's Medical Dictionary 678 (28th Ed. 2006).

pain.  (AR 515.)  He did not verbally complain of pain and there were no unusual postural adjustments to express or imply relief of pain.  (AR 515-516.)  Plaintiff was cooperative and his articulation was good.  (AR 516.)  There were no obvious behavioral abnormalities noted.  (AR 516.)  Dr. Gratton found:

> Mr. Miller's speech was fluent, prosodic, and free from paraphasic errors.  His mood was normothymic[5] and his affect was appropriate to ideational content.  The depth and range of his affect was broad and appropriately variable.  He denied visual and auditory hallucinations but alleged a history of both. . . .  His thought processes were logical and coherent and were not characterized by loosening of associations, clang associations, circumstantiality, tangentiality, perseveration, or flight of ideas.  His rate of mentation was within normal limits.  He was able to comprehend abstraction without difficulty.  His attentional capacity was within normal limits.  He was alert throughout the assessment.  He was oriented in all spheres.  All aspects of memory functioning appeared intact, although formal memory testing was not performed.  No vegetative symptoms were noted and were denied at questioning.

> In general, Mr. Miller was possibly less than a fully reliable historian.  He did not appear to malinger, embellish symptoms, or minimize his strengths in a particularly flagrant way, but inconsistencies between his report and his medical record suggests that he may have been minimizing his strengths.

(AR 516.)

Dr. Gratton found that Plaintiff did not appear fully motivated to present an honest depiction of his mental status.  (AR 516.)  Dr. Gratton stated that it is unusual for an individual to develop schizophrenia in his forties and for that reason found his description of auditory and visual hallucinations not to be credible.  (AR 516.)  There was no other indication of a formal thought disorder.  (AR 516.)

Based on the results of her assessment, Dr. Gratton opined that Plaintiff finds it generally easy to comprehend and carry out simple instructions from a cognitive standpoint and was not likely to be challenged by difficulties getting along with others.  (AR 516.)  His attention was sufficient to execute his daily activities.  (AR 516.)  Plaintiff would not be likely to decompensate under stressful conditions unless there was significant secondary gain available to him.  (AR 516.)  Plaintiff's attention to timely completion of tasks and assignments would not

---

[5] "Normothymic states in bipolar disorders are generally considered to be devoid of severe symptoms."  M'bailara, K.; Demotes-Mainard, et al., Emotional Hyper-Reactivity in Normothymic Bipolar Patients, (Feb. 11, 2009) http://www.ncbi.nlm.nih.gov/pubmed/19133967

1    necessarily probe difficult and he would be capable of self-management of funds.  (AR 516.)

2    On September 22, 2010, Dr. Gore completed a mental residual functional capacity

3    assessment and found that Plaintiff was moderately limited in his ability to interact appropriately

4    with the general public, ability to accept instructions and respond appropriately to criticism, and

5    ability to get along with coworkers or peers without distracting them or exhibiting behavioral

6    extremes.  Dr. Gore found Plaintiff not significantly limited in all other areas.  (AR 519.)  Dr.

7    Gore opined that Plaintiff could follow rules and remember simple one or two step instructions;

8    attend to simple repetitive tasks for two hour blocks of time in an eight hour workday without

9    significant interference from psychiatric symptoms, make simple work-related decisions, and

10   respond to minor changes in work routine with minimal supervision.  (AR 520.)  He opined that

11   Plaintiff should not work with the public or in the stress of close coordination with others, but

12   can work in the presence of others and accept supervision and feedback regarding work

13   performance in a non-stressful routine.  (AR 520.)  Dr. Gore found Plaintiff could make simple

14   plans, set simple goals with moderate difficulty, avoid common workplace hazards; and use

15   public transportation, and maintain appropriate appearance and hygiene.  (AR 520.)  Plaintiff's

16   adaptation was moderately limited.  (AR 520.)

17   Dr. Gore found Plaintiff to be mildly restricted in his activities of daily living and

18   maintaining concentration, persistence or pace and moderately limited in maintaining social

19   functioning.  (AR 532.)  There were no episodes of decompensation.  (AR 532.)  Dr. Gore noted

20   that Plaintiff had a history of psychosis with improvement in the most recent notes.  (AR 534.)

21   Additionally, there is limited recent treatment history and Plaintiff returned to treatment due to a

22   court order.  (AR 534.)

23   On November 22, 2010, Plaintiff saw Dr. Perez.  (AR 562-565.)  Plaintiff was alert and

24   oriented to person, time, and place.  (AR 563.)  He was cooperative, calm, and speech was

25   normal.  (AR 563.)  Plaintiff's memory was grossly intact and his mood and affect were

26   euthymic.  (AR 563.)  Plaintiff thought process was coherent and thought content was normal.

27   (AR 563.)  Plaintiff denied any hallucinations.  (AR 563.)

28   On March 31, 2011, a psychiatric review technique was completed by Dr. Steven Kaye.

(AR 589-602.  Dr. Kaye found Plaintiff to be mildly limited in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (AR 599.)  Dr. Kaye noted that although Plaintiff contends that his symptoms are getting worse, the allegation is not credible.  (AR 601.)  Medical records from his provider show that he is doing well.  (AR 601.)  Plaintiff has not returned for treatment since November 22, 2010.  (AR.)  His mental status examination on that date was within normal limits and there was no evidence of paranoia or psychosis.  (AR 601.)

Plaintiff was seen by Dr. Thao on May 15, 2012.  (AR 620-625.)  Dr. Thao diagnosed Plaintiff with bipolar disorder, provisional, asthma, and chronic pain with a GAF of 51.  (AR 620.)  Dr. Thao found that Plaintiff had emotional lability, impairment of impulse control, and paranoid thinking or inappropriate suspiciousness.  (AR 621.)

Dr. Kalman examined Plaintiff on June 14, 2013, and completed the questionnaire on the same date.  (AR 631-634, 637-644.)  The source of information for the report were Plaintiff "who was a poor historian and his family who were better historians and accompanying records which included diagnosis of Bipolar I disorder, severe with psychotic features."  (AR 631.)

During the evaluation, Plaintiff told the examining doctor that he last worked in 2009, "but his brother corrected him."  (AR 632.)  Dr. Kalman was informed that Plaintiff had not worked since the 1990s.  (AR 632.)  Dr. Kalman was told that medications were not helping and that Plaintiff was hospitalized twice in the 1990s on a 5150.  (AR 631-632.)  Dr. Kalman's findings were based upon his current examination and observation of Plaintiff.  (AR 639.)

Dr. Kalman found Plaintiff markedly limited in his ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to work in coordination with or proximity to others without being distracted by them, ability complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to set realistic goals or make plans independently.  Plaintiff was found to be moderately limited in his

ability to remember locations and work-like procedures, ability to understand and remember one or two step instructions, ability to carry out one or two step instructions, ability to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerance, ability to sustain ordinary routine without supervision, ability to make simple work related decisions, ability to ask simple questions or request assistance, ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and ability to travel to unfamiliar places or use public transportation.  Plaintiff was mildly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, ability to respond appropriately to changes in the work setting, and ability to be aware of normal hazards and take appropriate precautions.  (AR 640-642.)

Dr. Kalman reported that Plaintiff's symptoms and limitations applied since 1995.  (AR 644.)  Dr. Kalman found Plaintiff to be somewhat tense, guarded.  (AR 632.)  His speech was average rate and volume; eye contact was fair.  (AR 632.)  Plaintiff's responses were delayed and he appeared confused.  (AR 632.)  He was alert to person, place, and situation, but did not know the date.  (AR 632.)  Plaintiff could recall none of three objects at five minutes.  (AR 632.)  He was able to repeat three digits forward and two digits backwards.  (AR 632.) He could not do serials or spell "world" backwards.  (AR 632.)

Plaintiff was unable to do basic math and his intelligence was found to be below average.  (AR 633.)  Plaintiff recalled two of the past five presidents.  (AR 633.)  His abstractions were not intact.  He stated that "apples are not oranges," and a dog and cat were both "simple boy and girl."  (AR 633.)  Plaintiff did not know proverbs.  (AR 633.)  Plaintiff stated if he found a stamped envelope on the ground he would "keep going," and if he were the first person in a theater to see a fire, he would "keep going."  (AR 633.)

Dr. Kalman found Plaintiff's insight into his mental illness and judgment to be poor. (AR 633.)  Plaintiff's mood was depressed, irritable, perplexed and affect and emotions were labile.[6]  (AR 633.)  Plaintiff denied suicidal or homicidal thoughts.  (AR 633.)  Plaintiff had

---

[6] Denoting free and uncontrolled mood or behavioral expression of the emotions.  Stedman's Medical Dictionary 1037 (28th Ed. 2006).

1   insomnia with nightmares, and impaired memory, attention and concentration.  (AR 633.)  His

2   thought process was illogical at times, disorganized, vague.  (AR 633.)  There were no loose

3   associations or mood swings.   (AR 633.)   Plaintiff's thought process was positive for

4   hallucinations.  (AR 633.)  No delusions were elicited.  (AR 633.)

5          Dr. Kalman stated that Plaintiff does not do his own shopping, cooking and

6   housekeeping, and cannot manage his own transportation.  (AR 633.)  He is capable of caring for

7   his own personal hygiene, but does not pay his own bills.  (AR 633.)  Plaintiff sometimes gets

8   along with his family and has few friends.  A typical day is described as playing with his dog,

9   riding his bike, watching cooking shows and trying to stay calm and away from people.  (AR

10  633.)  Plaintiff was diagnosed with schizoaffective disorder; cognitive disorder, secondary to

11  head trauma; post traumatic stress disorder; antisocial personality disorder; borderline

12  intellectual functioning; status post head trauma; severed artery in left arm with decreased

13  strength and mobility; chronic back pain; illness in self; and had a GAF of 45.  (AR 634.)

14         Dr. Kalman opined that Plaintiff was incapable of tolerating even low work stress, and

15  would miss more than three days a month as a result of his impairments or treatment.  (AR 643-

16  644.)

17         2.   Discussion

18         Although Dr. Kalman noted on the form that Plaintiff's limitations date to 1995, this is

19  clearly contrary to the record which shows that Plaintiff worked until 2009.  (AR 62, 191.)

20  Further, during those periods of time prior to 2010 in which Plaintiff was not working it was not

21  due to a disability, but because he was incarcerated.  (AR 218.)  Dr. Kalman's opinion that

22  Plaintiff's limitations dated to 1995 is contrary to the record as a whole and appears to be based

23  on false statements by Plaintiff's family that he had not worked since the 1990s.

24         Dr. Kalman based his opinion of Plaintiff's limitations on his current assessment of

25  Plaintiff.  Dr. Kalman's description of Plaintiff is inconsistent with the prior medical record.  Dr.

26  Kalman found Plaintiff to be confused and he did not know the date.  (AR 632.)  However,

27  Plaintiff's prior medical records show he presented for his appointments oriented to person,

28  place, and time.  (AR 464, 506, 510, 516, 545, 563.)  While Dr. Kalman found Plaintiff to be

confused, other than a single instance where Plaintiff's thought process was found to be circumlocuitous (AR 546), his other physicians found that he was coherent.  (AR 503, 507, 511, 516, 563.)  Dr. Kalman found Plaintiff to be depressed, irritable, and perplexed, but the record demonstrates that his prior physicians found him to be alert and cooperative, with no finding of depression.  (AR 504, 506, 563.)  Dr. Kalman also found Plaintiff's long term memory to be impaired, while his medical record shows that, other than his initial appointment with Dr. Perez prior to starting back on his medication, his memory was grossly intact.  (AR 503, 507, 511, 516, 546, 563.)

Dr. Kalman only examined Plaintiff on one occasion; a year after the ALJ issued her decision.   The medical record demonstrates that initially, Plaintiff was found to have hallucinations, (AR 503, 546), once on his medication these symptoms were controlled (AR 507, 511, 563).  Also, while Plaintiff did suffer from some paranoia, he stated that these symptoms were controlled on medication.  Dr. Gratton found that other than Plaintiff's allegations of auditory and visual hallucinations, there was no indication of a formal thought disorder.  On November 22, 2010, Dr. Perez found his thought content to be normal.  Dr. Kalman's opinion finding Plaintiff markedly and moderately limited in almost all areas is inconsistent with the medical record prior to the ALJ's June 14, 2012 opinion.

The ALJ found that Plaintiff received routine and conservative care for his mental health issues.  As discussed above, there is substantial evidence in the record that Plaintiff only received intermittent outpatient treatment for his mental health issues.  Plaintiff had a consultative examination with Dr. Gratton on September 14, 2010.  While Dr. Gratton did question Plaintiff's complaints of auditory and visual hallucinations, her findings were within normal limits and indicated no formal thought disorder.  Dr. Perez' August 25, 2010 and November 22, 2010 notes contain similar findings.  Other than the consultative examination with Dr. Kalman, the record demonstrates that Plaintiff did not receive any further mental health treatment after his last visit with Dr. Perez on November 22, 2010.  In viewing the record as a whole, the ALJ's decision in regards to Plaintiff's mental health issues is supported by substantial evidence.

///

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in finding that Plaintiff's subjective complaints were not credible or in determining his mental capacity limitations. However, the ALJ did err by relying on the inconsistent opinion of Dr. Walker.  Accordingly,

IT IS HEREBY ORDERED that

1.    Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED IN PART AND DENIED IN PART.

2.    Defendant's motion cross motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

3.    The Court REMANDS this action back to the Commissioner for further administrative proceedings consistent with this opinion.

4.    It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Mika Miller and against Defendant Commissioner of Social Security.

5.    The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **December 23, 2014**

_____
UNITED STATES MAGISTRATE JUDGE